UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MERCY HOSPITAL, INC.<br><br>    Plaintiff,<br><br>    v.<br><br>SYLVIA M. BURWELL, Secretary, United States Department of Health and Human Services,<br><br>    Defendant. | Civil Action No. 15-1236 (JDB) |

## MEMORANDUM OPINION

Plaintiff Mercy Hospital operates an inpatient rehabilitation facility that is eligible for reimbursement under Medicare. The Hospital believed that the Medicare contractor responsible for determining the reimbursement amounts applied the wrong formula for the years 2002, 2003, and 2004, so it filed an administrative appeal. The Provider Reimbursement Review Board agreed with the Hospital. But the Administrator of the Centers for Medicare and Medicaid Services reversed the Board's decision, concluding that a statutory provision precluded administrative or judicial review of the contractor's reimbursement determination. The Hospital now seeks judicial review of that decision. The Hospital argues that the Administrator has read the statutory provision too broadly, and that the type of error alleged here is not shielded from review. The Court concludes, however, that the plain language of the statute precludes review of the contractor's determination. The case will therefore be dismissed.

## BACKGROUND

Under Medicare, inpatient rehabilitation facilities are reimbursed pursuant to a prospective payment system. In this context, "prospective" does not mean that a facility is paid in advance, but rather that its reimbursement is based on payment rates fixed in advance, and not on the

1

facility's actual costs. See Washington Hosp. Ctr. v. Bowen, 795 F.2d 139, 142 n.2 (D.C. Cir. 1986) (discussing the analogous prospective payment system for acute care hospitals). The statutory foundation of the prospective payment system for inpatient rehabilitation facilities is found at 42 U.S.C. § 1395ww(j). (While the Court will do its best to summarize the relevant features of § 1395ww(j), the reader will benefit from having a copy of the provision at hand.)

Subparagraph (3)(A) instructs the Secretary of the Department of Health and Human Services (HHS) to "determine a prospective payment rate for each payment unit for which [a] rehabilitation facility is entitled to receive payment under this subchapter." A "payment unit" refers to a discharge, § 1395ww(j)(1)(D), meaning that the Secretary must determine a rate applicable to each discharged patient. The Secretary begins by estimating "the average payment per payment unit . . . for inpatient operating and capital costs of rehabilitation facilities using the most recent data available," § 1395ww(j)(3)(A); in other words, she estimates the costs associated with the average inpatient rehabilitation patient. That average amount is then adjusted for five factors listed in clauses (i) through (v) of subparagraph (3)(A). First, it is increased for inflation by a factor based on price increases in a relevant market basket of goods and services. Second, it is reduced somewhat as a counterbalance or offset for additional payments made in certain unusually high-cost "outlier" cases. Third, it is adjusted to reflect variations in local labor costs (the "area wage adjustment"). Fourth, it is adjusted by a "weighting factor" that depends on the costs associated with the category of case—the "case mix group," in the statute's terminology— into which the patient falls (e.g., spinal injury, stroke, amputation, etc.). Finally, it is adjusted "by such other factors as the Secretary determines are necessary to properly reflect variations in necessary costs of treatment among rehabilitation facilities."

Note a feature of subsection (j) that will later become important: Although the instructions to apply these five adjustments are located within paragraph (3), the details of some of the adjustments are located in other paragraphs. For example, clause (3)(A)(iv) instructs the Secretary to apply the weighting factor adjustment, but it is paragraph (2) that actually tells the Secretary to establish the case mix groups and to assign a weighting factor to each. Similarly, clause (3)(A)(iii) instructs the Secretary to apply the area wage adjustment, but the parameters of that adjustment are explained in paragraph (6). This is not true, however, of the final, "other factors" adjustment in clause (3)(A)(v). Because that clause is an authorization for the Secretary to develop other adjustments through the administrative process, there is no cross-reference to other portions of the statute.

This case concerns one such "other factors" adjustment that the Secretary has authority to develop under clause (v): the Low-Income Percentage (LIP) adjustment. The LIP adjustment is designed to increase the payment rate at facilities that serve a significant number of low-income patients, "because as a facility's percentage of low-income patients increases, there is an incremental increase in a facility's costs." Medicare Program; Prospective Payment System for Inpatient Rehabilitation Facilities, 66 Fed. Reg. 41,316, 41,360 (Aug. 7, 2001) (promulgating the LIP adjustment). For present purposes, the formula by which a facility's LIP adjustment is calculated need not be explained in full; it is enough to know that it depends in part on determining the number of the facility's patients who were eligible for Medicaid but not entitled to benefits under Part A of Medicare. See id. (incorporating the "DSH" measure into the LIP adjustment); Ne. Hosp. Corp. v. Sebelius, 657 F.3d 1, 3, 5 (D.C. Cir. 2011) (explaining the "DSH" measure in detail).

The determination of the prospective payment rates (including LIP adjustment) that a provider will receive for each of its discharged patients is performed by a contractor serving as the Secretary's agent. The contractor makes this determination and issues a notice of total program reimbursement after receiving detailed cost reports and patient information from the provider. See 42 C.F.R. § 405.1803; id. § 412.604(g). As a general matter, if a Medicare provider is dissatisfied with a contractor's final determination of the reimbursement due for a given fiscal year, the provider may appeal to an administrative tribunal called the Provider Reimbursement Review Board. 42 U.S.C. § 1395oo(a)(1)(A)(i). The Board's decision is final unless the Secretary—acting through the Administrator of the Centers for Medicare and Medicaid Services (CMS)—reverses, affirms, or modifies the Board's decision. § 1395oo(f)(1). A provider generally has "the right to obtain judicial review of any final decision of the Board, or of any reversal, affirmance, or modification by the Secretary" by filing suit within 60 days. Id.

Plaintiff Mercy Hospital operates an inpatient rehabilitation facility eligible for reimbursement under Medicare. The Hospital was dissatisfied with the notices of reimbursement it received from its Medicare contractor for fiscal years 2002, 2003, and 2004. In particular, the Hospital believed that the contractor had improperly determined its LIP adjustment by taking an erroneous view of which of its patients were entitled to benefits under Part A of Medicare. The Hospital accordingly appealed to the Provider Reimbursement Review Board. After concluding that it had authority to hear the appeal, the Board sided with the Hospital. Mercy Hosp. v. First Coast Serv. Options, Inc., PRRB Dec. No. 2015-D7, 2015 WL 10381780 (Apr. 3, 2015). The Board agreed with the Hospital that Northeast Hospital Corp. v. Sebelius, 657 F.3d 1—which addressed a closely related adjustment applied to acute care hospitals—mandated the Hospital's interpretation of the LIP adjustment.

The Administrator of CMS vacated the Board's decision. Mercy Hosp. v. First Coast Serv. Options, Inc., Review of PRRB Dec. No. 2015-D7, 2015 WL 3760091 (June 1, 2015). The Administrator concluded that the Board had lacked authority to hear the Hospital's appeal in light of 42 U.S.C. § 1395ww(j)(8). Entitled "Limitation on review," paragraph (8) provides in full:

> There shall be no administrative or judicial review under section 1395ff of this title, 1395oo of this title, or otherwise of the establishment of—
>
> (A) case mix groups, of the methodology for the classification of patients within such groups, and of the appropriate weighting factors thereof under paragraph (2),
>
> (B) the prospective payment rates under paragraph (3),
>
> (C) outlier and special payments under paragraph (4), and
>
> (D) area wage adjustments under paragraph (6).

In the Administrator's view, by attacking the contractor's determination of the applicable LIP adjustment, the Hospital was attempting to challenge "the establishment of . . . the prospective payment rates under paragraph (3)." Review by the Board was therefore precluded by subparagraph (8)(B). The Administrator vacated the Board's decision without reaching the merits of the dispute over the LIP adjustment.

The Hospital timely filed this lawsuit, which asks the Court to set aside the Administrator's decision precluding review and to declare that the contractor's interpretation of the LIP adjustment is invalid. The Secretary has moved to dismiss, noting that § 1395ww(j)(8) precludes "administrative or judicial review" of the listed determinations. The question before the Court is thus whether this limitation on review is indeed as broad as the Secretary suggests.

## DISCUSSION

Federal courts apply a "strong presumption" that judicial review of administrative action is available. See, e.g., Mach Mining, LLC v. EEOC, 135 S. Ct. 1645, 1651 (2015) (internal quotation marks omitted). Accordingly, when a statute is "reasonably susceptible to divergent

5

interpretation" on the question, a court should adopt the reading that permits review. Kucana v. Holder, 558 U.S. 233, 251 (2010) (internal quotation marks omitted). Like all interpretive presumptions, however, this one can be rebutted. If a statute's "language or structure" makes clear that Congress intended to foreclose review, the presumption is overcome. Mach Mining, 135 S. Ct. at 1651. Here, there is no doubt that § 1395ww(j)(8) reflects clear congressional intent to block judicial review. The debate is over the breadth of the bar: specifically, does it preclude review of the contractor's LIP adjustment determination?

The Secretary says yes, and her affirmative case is simple and persuasive. Subparagraph (8)(B) of the statute forbids administrative or judicial review of "the establishment of . . . the prospective payment rates under paragraph (3)." The paragraph (3) process by which a provider's prospective payment rates are established includes the LIP adjustment: it is an "other factor" under clause (3)(A)(v). Put another way, the LIP adjustment is a component of a prospective payment rate, much as a first baseman is a component of a baseball lineup. To suggest that a manager should put a different player on first is necessarily to suggest that he should change the lineup. Similarly here, to challenge the calculation of the LIP adjustment is ultimately to challenge the determination of the prospective payment rates. That is precisely what subparagraph (8)(B)'s limitation on review prohibits. The Court therefore lacks jurisdiction to hear the Hospital's challenge.

The heart of the Hospital's contrary theory is that the phrase "prospective payment rates" in subparagraph (8)(B) does not refer to the final rates that a provider actually receives; rather, it refers to the base, unadjusted rates that are the starting point of the rate-setting process. In the Hospital's view, then, while providers cannot challenge the unadjusted rates, they can challenge

whether the contractor properly applied the LIP adjustment in the course of setting the ultimate rates.

But the Hospital's various arguments in favor of this theory (which the Court will examine further below) all run into an insurmountable hurdle: paragraph (3) unambiguously uses the phrase "prospective payment rate" to refer to the final, post-adjustment rate. The key statutory text, truncated slightly for easier parsing, is this:

> The Secretary shall determine a prospective payment rate for each payment unit for which [a] rehabilitation facility is entitled to receive payment under this subchapter. . . . [S]uch rate for payment units . . . shall be based on the average payment per payment unit under this subchapter for inpatient operating and capital costs of rehabilitation facilities using the most recent data available . . . adjusted [by the adjustments in clauses (i) through (v)].

§ 1395ww(j)(3)(A). To condense further, the Secretary must determine the "prospective payment rate" for each payment unit; "such rate" is the "average payment per payment unit . . . adjusted" by various adjustments. Thus, there is simply no doubt that Congress used the term "prospective payment rate" here in paragraph (3) to mean the <u>ultimate</u> payment rate, <u>after</u> the adjustments are factored in. In the provision limiting review, therefore, the phrase "the prospective payment rates under paragraph (3)" also seems clearly to refer to the ultimate, post-adjustment rates.

So why does the Hospital think that only the pre-adjustment rates are shielded from review? It offers what the Court views as six related arguments.

**1.** The Hospital's foremost argument is that the Secretary's interpretation of "the prospective payment rates under paragraph (3)" would render the other items listed in paragraph (8) surplusage. Recall that paragraph (8) blocks review of the establishment of four things:

> (A) case mix groups, of the methodology for the classification of patients within such groups, and of the appropriate weighting factors thereof under paragraph (2),
> (B) the prospective payment rates under paragraph (3),
> (C) outlier and special payments under paragraph (4), and

7

(D) area wage adjustments under paragraph (6).

If "the prospective payment rates under paragraph (3)" encompasses the *adjusted* rates, says the Hospital, then why did Congress separately block review of the weighting factors, outlier and special payments, and area wage adjustments? Those are all parts of the adjustment process, the Hospital continues, so if the Secretary's reading were correct, review of those items would already be precluded by subparagraph (8)(B). Thus, concludes the Hospital, by rendering subparagraphs (8)(A), (8)(C), and (8)(D) redundant, the Secretary's reading violates the interpretive canon that statutory language should not be construed as surplusage.

This surplusage argument fails to persuade. For starters, it has oft been noted that this canon "is not an absolute rule." King v. Burwell, 135 S. Ct. 2480, 2492 (2015) (internal quotation marks omitted); accord id. at 2498 (Scalia, J., dissenting). Sometimes there is no way to give independent force to every word in a statute, and "[n]o canon of construction justifies construing the actual statutory language beyond what the terms can reasonably bear." Amoco Prod. Co. v. Watson, 410 F.3d 722, 734 (D.C. Cir. 2005) (Roberts, J.); see also Brett M. Kavanaugh, Fixing Statutory Interpretation, 129 Harv. L. Rev. 2118, 2161–62 (2016). Moreover, statutory redundancy is sometimes logically explained by the legislature's desire "simply, in Macbeth's words, 'to make assurance double sure.'" Shook v. D.C. Fin. Responsibility & Mgmt. Assistance Auth., 132 F.3d 775, 782 (D.C. Cir. 1998). In other words, sometimes Congress uses overlapping or seemingly redundant terms or phrases "to remove any doubt" about an issue. Ali v. Fed. Bureau of Prisons, 552 U.S. 214, 226 (2008).

Here, assuming the Secretary's reading does entail some redundancy, Congress had good reason to take a belt-and-suspenders approach in drafting paragraph (8). The reason, alluded to earlier, is that although paragraph (3) instructs the Secretary to apply the adjustments, the provisions that actually authorize and describe the mechanics of several of the adjustments are

located outside of paragraph (3). The nature of the area wage adjustment, for instance, is only spelled out in paragraph (6). As the Secretary notes, if the statute blocked review of only "the establishment of . . . the prospective payment rates under paragraph (3)," providers could argue that the area wage adjustment remained subject to review because it is actually calculated pursuant to paragraph (6), not paragraph (3). Similarly, providers could argue that the weighting factors assigned to case mix groups remained subject to review because they are established under paragraph (2). Separately identifying each item as unreviewable was the rational way for Congress to make "double sure" that the entire process was placed out of reach. And this remove-any-doubt interpretation of paragraph (8) is more plausible than the Hospital's suggestion that "prospective payment rates" means the unadjusted rates. As already explained, that suggestion is flatly incompatible with paragraph (3)'s use of the term.

Moreover, the Hospital has overstated the degree of redundancy. Consider subparagraph (8)(C), which blocks review of "outlier and special payments under paragraph (4)." The Hospital's opposition treats these payments as part of the rate-adjustment process and so argues that this provision would be unnecessary if "prospective payment rates" means what the Secretary says it means. But, as the Hospital acknowledged at the hearing on the Secretary's motion, that's not quite right. The statute does not treat an outlier payment as a component of a prospective payment rate; an outlier payment is "an additional payment" received on top of a prospective payment rate. See § 1395ww(j)(4)(A)(i). It is true that these additional payments are relevant to the determination of the prospective payment rates, but only in that clause (3)(A)(ii) of the adjustment process requires a reduction designed to be an offset for outlier and special payments. So consider a provider who thinks it should have received a larger outlier payment for a particular patient. That provider is not trying to challenge the prospective payment rate assigned to the patient; it is trying

9

to challenge the amount of the "additional payment." In order to foreclose this kind of challenge, Congress needed to block review of "outlier and special payments under paragraph (4)" <u>in addition to</u> "the prospective payment rates under paragraph (3)."

**2.** The Hospital next argues that other uses of the term "prospective payment rates" in subsection (j) refer to the unadjusted rates—but its examples are not persuasive. First, the Hospital claims that paragraph (6) says that the Secretary "'shall adjust . . . the prospective payment rates computed under paragraph (3) for area differences in wage levels.'" Pl.'s Opp'n [ECF No. 11] at 21. If the Secretary is required to "adjust . . . the prospective payment rates," the Hospital argues, that proves that the term "prospective payment rates" refers to the rates <u>before</u> the adjustments have been applied. But the Hospital has mistaken the grammatical structure of the first sentence of paragraph (6). Omitting only two parenthetical phrases, here is the sentence in full:

> The Secretary shall adjust the proportion . . . of rehabilitation facilities' costs which are attributable to wages and wage-related costs, of the prospective payment rates computed under paragraph (3) for area differences in wage levels by a factor . . . reflecting the relative hospital wage level in the geographic area of the rehabilitation facility compared to the national average wage level for such facilities.

This is not an elegant sentence. It is perhaps not even a grammatically coherent sentence. But it is clear that the object of the verb "adjust" is not (as the Hospital would have it) "the prospective payment rates"; rather, it is "the proportion." That is the more natural reading of the sentence, and is also the D.C. Circuit's reading of a nearly identical sentence elsewhere in § 1395ww. See <u>Se. Ala. Med. Ctr. v. Sebelius</u>, 572 F.3d 912, 914–15 (D.C. Cir. 2009). This provision therefore does not show that the term "prospective payment rates" ever means the unadjusted rates.

The Hospital makes a similar argument about clause (3)(A)(ii), which identifies the second adjustment to be applied. It refers to "reducing such rates by a factor" designed to offset the outlier and special payments. The Hospital says that if "such rates" are the "prospective payment rates,"

10

then "reducing such rates" is possible only if they are the unadjusted rates. Pl.'s Opp'n at 23. But it is not clear that "such rates" in clause (ii) means "prospective payment rates." "[S]uch rates" could just as easily mean the unadjusted rates, or the rates adjusted only for inflation (the subject of clause (i)). The Hospital's argument presumes its own conclusion; clause (ii) does not prove that "prospective payment rates" are the unadjusted rates.

Nor is the Hospital's position supported by paragraph (5), which instructs the Secretary that each fiscal year she must publish "the classification and weighting factors for case mix groups under paragraph (2) for such fiscal year and a description of the methodology and data used in computing the prospective payment rates under this subsection for that fiscal year." The Hospital argues that if "prospective payment rates" means the fully adjusted rates, then the weighting factors would necessarily be part of the "methodology . . . used in computing the prospective payment rates"—and there would therefore be no need for Congress to have required publication of both the weighting factors and the methodology. Pl.'s Opp'n at 22. This is a remarkably tenuous surplusage argument. As the Secretary notes, while the weighting factors are a direct component of the prospective payment rates mentioned in paragraph (3), the classification scheme is not, so Congress needed to separately require its publication. And given the close connection between the classification scheme and the weighting factors, it was natural for Congress to list them as a pair in paragraph (5). To infer from this that the weighting factors must not be involved "in computing the prospective payment rates" (and hence that "the prospective payment rates" are the unadjusted rates) is to make an interpretive mountain out of what is at most a molehill of redundancy.

At the motions hearing, the Hospital also relied on the use of "prospective payment rates" in paragraph (4), but the Court is again unpersuaded. The term is found in clause (4)(A)(iii), which

11

says that the total amount of outlier payments (across all providers) in a given year "may not exceed 5 percent of the total payments projected or estimated to be made based on prospective payment rates for payment units in that year." The Court sees nothing here to suggest that "prospective payment rates" must mean the unadjusted rates. On the contrary, it seems far more logical here for "prospective payment rates" to mean the final rates that providers actually receive. Because no one actually receives unadjusted rates, an estimate of "the total payments . . . to be made based on" unadjusted rates is not a meaningful figure. Why would Congress tie the cap on outlier payments to an amount that is by definition not an estimate of the total amount actually being paid to providers? If anything, then, paragraph (4) reinforces the conclusion that "prospective payment rates" are the final, adjusted rates—the rates that providers in fact receive.

**3.** The Hospital next argues that the Secretary herself used to believe that only the unadjusted rates were unreviewable. The Hospital points out that when the Secretary promulgated the initial regulations on the prospective payment system for inpatient rehabilitation facilities in 2001, she described the limitation on review as covering "the establishment of the methodology to classify a patient into the case-mix groups and the associated weighting factors, the unadjusted Federal per discharge payment rates, additional payments for outliers and special payments, and the area wage index." 66 Fed. Reg. at 41,393 (emphasis added) (codified at 42 C.F.R. § 412.630 (2002)). Only in 2013 did the Secretary delete the word "unadjusted" from its regulation describing the limitation on review and adopt its current view. See Medicare Program; Inpatient Rehabilitation Facility Prospective Payment System for Federal Fiscal Year 2014, 78 Fed. Reg. 47,860, 47,900–01 (Aug. 6, 2013). The Hospital contends that the earlier regulation is evidence that the Hospital has the better reading of the statute, or at least that the statute is ambiguous on

this point, in which case the presumption in favor of review would tip the case in the Hospital's favor. Pl.'s Opp'n at 33–34.

The Court does not find the old regulation persuasive. (But nor, to be clear, is the Court giving deference to the new regulation.) In promulgating the old regulation, the Secretary did not provide any statutory analysis of paragraphs (3) and (8) or any explanation of where the word "unadjusted" came from. See 66 Fed. Reg. at 41,369 (final rule); Medicare Program; Prospective Payment System for Inpatient Rehabilitation Facilities, 65 Fed. Reg. 66,304, 66,363 (Nov. 3, 2000) (proposed rule). Given that, for all the Court can tell, the earlier regulation rested on no statutory analysis whatsoever, the Court does not find the use of "unadjusted" probative. Cf. Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117, 2127 (2016) (denying deference to an agency's unreasoned interpretation of a statute). For the reasons already explained, paragraph (3) clearly uses "prospective payment rate" to mean the final, adjusted rate that a provider actually receives.

**4.** The Hospital also argues that there is good reason to think Congress wanted review of the "other factors" adjustments under clause (v), even if the adjustments specified in clauses (i) through (iv) are unreviewable. "It makes eminent sense that Congress would shield adjustments from review when it had specified the contours of the adjustment, but leave judicial review available as a check on whatever adjustments the Secretary dreams up" pursuant to clause (v). Pl.'s Opp'n at 31. The Hospital's point is a reasonable one. But the fact that it might make good sense to draw a distinction between clause (v) and the other four is weak evidence that Congress did draw this distinction. The limitation on review refers to "the establishment of . . . the prospective payment rates under paragraph (3)." Clause (v) is just as much a part of paragraph (3), and of the process by which the prospective payment rates are set, as are the other four clauses. Moreover, the Hospital is not arguing that the LIP adjustment—either as the Hospital interprets it

13

or as the contractor did—is an adjustment the Secretary lacks authority to enact under clause (v); the Hospital is merely arguing that it was misapplied. This case thus does not present the question whether a provider could challenge an adjustment that the Secretary promulgated under clause (v) as ultra vires. Cf. Amgen, Inc. v. Smith, 357 F.3d 103, 112–13 (D.C. Cir. 2004) (interpreting a Medicare provision foreclosing review of "other adjustments" to include adjustments created by regulation, but not to foreclose a challenge that an adjustment was unauthorized by statute).

**5.** The Hospital also contends that if the limitation on review were as broad as the Secretary urges, then there would be nothing for inpatient rehabilitation providers to challenge. Why let inpatient rehabilitation facilities have a theoretical pathway to appeal if everything they would conceivably wish to appeal is placed off limits? Pl.'s Opp'n at 20–21. But the Secretary's interpretation does not leave inpatient rehabilitation providers with nothing to appeal. Suppose that a contractor failed to account for a number of patients altogether, proposing reimbursement for 475 Medicare beneficiaries instead of the 600 Medicare beneficiaries that the provider believed it had treated. A challenge to the contractor's decision to exclude those 125 patients would not be a challenge to the prospective payment rates, and so would not be barred by paragraph (8)'s limitation on review.

And even if the Secretary's interpretation of paragraph (8) leaves inpatient rehabilitation facilities with highly circumscribed appeal rights, that is not absurd or contradictory. The statutory provision that lets inpatient rehabilitation facilities seek judicial review, § 1395oo, is a general provision that applies to all types of Medicare providers, not just inpatient rehabilitation facilities. The Secretary's reading of paragraph (8), which is specifically addressed to inpatient rehabilitation facilities, therefore does not create a contradiction. See RadLAX Gateway Hotel, LLC v.

Amalgamated Bank, 132 S. Ct. 2065, 2071 (2012) ("It is a commonplace of statutory construction that the specific governs the general." (brackets and internal quotation marks omitted)).

**6.** Finally, the Hospital invokes the canon that statutes should be construed in a way that avoids placing their constitutionality in doubt. The Hospital suggests that it has a property right in the correct reimbursement amount and that if it cannot seek review of the LIP adjustment it will have been deprived of that property without due process of law. Pl.'s Opp'n at 27–29. But the constitutional-doubt canon does no work that isn't already done by the presumption in favor of judicial review of agency action. Like that presumption, the constitutional-doubt canon is a rule for choosing between "reasonable alternative interpretation[s]." Gomez v. United States, 490 U.S. 858, 864 (1989). If there is only one reasonable interpretation—"if the statute is clear"—then the canon plays no role. Voisine v. United States, 136 S. Ct. 2272, 2282 n.6 (2016). Here, as the reader is by now likely tired of hearing, it is clear that the "prospective payment rate" described in paragraph (3) is the final, fully adjusted rate. It is therefore equally clear that the limitation on review of "the establishment of . . . the prospective payment rates under paragraph (3)" forecloses review of the LIP adjustment.

## CONCLUSION

For the foregoing reasons, the Court agrees with the Secretary that 42 U.S.C. § 1395ww(j)(8) prohibits administrative or judicial review of the contractor's interpretation of the LIP adjustment, because such review amounts to review of the establishment of the Hospital's prospective payment rates. The Court will therefore grant the Secretary's motion and dismiss the case for lack of subject-matter jurisdiction.

/s/
JOHN D. BATES
United States District Judge

Dated: July 25, 2016